**Deborah S. CROSS, Marilyn V. Brooks, Judy A. Barnes, Mary E. Phillips and Nicholas F. Williams, Petitioners,**

v.

**DEPARTMENT OF TRANSPORTATION and Interstate Commerce Commission, Respondents.**

**Nos. 97–3123 through 97–3127.**

United States Court of Appeals, Federal Circuit.

Oct. 15, 1997.

Rehearing Denied Dec. 9, 1997.

Charles E. Wagner, Wagner & Associates, Washington, DC, argued, for petitioners.

Lesleyanne Koch Kessler, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, DC, argued, for respondents. With her on brief were Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, and Kirk T. Manhardt, Assistant Director.

Before NEWMAN, LOURIE, and RADER, Circuit Judges.

LOURIE, Circuit Judge.

Deborah S. Cross, Marilyn V. Brooks, Judy A. Barnes, Mary E. Phillips, and Nicholas F. Williams (Petitioners) seek review of the final decision of the Merit Systems Protection Board affirming Petitioners' removal during two successive reductions in force (RIFs). *Cross v. Department of Transp.*, 72 M.S.P.R. 324, Docket No. DC0351960377I–1 et al. (Nov. 25, 1996). Because the board did not err in concluding that the transfers of function and the RIFs associated with the abolition of the Interstate Commerce Commission (ICC) were proper, and because the board's factual findings are supported by substantial evidence, we affirm.

## BACKGROUND

The ICC was abolished on January 1, 1996 by an act of Congress. ICC Termination Act of 1995, Pub.L. No. 104–88, § 101, 109 Stat. 803, 804 (Dec. 29, 1995). That act eliminated many of the functions performed by the ICC, transferred certain core rail and other functions to its successor agency, the Surface Transportation Board (STB), and transferred certain motor carrier functions to the Federal Highway Administration (FHA) within the Department of Transportation.

Approximately seven months earlier, during the summer of 1995, Congress began debating legislation that would abolish the ICC. As indicated in a House Report accompanying the related appropriations bill, H.R. 2002, the administration planned to "sunset" the ICC in 1996 and make sweeping changes to the functions performed by that agency as part of a broad deregulation of the transportation industry. H.R.Rep. No. 104–177, at 171 (1995). As part of this effort, the ICC was to be funded at a level "to ensure that the Commission terminates it[s] operations by December 31, 1995." *Id.* On November 3 and 9, bills to abolish the ICC were introduced for consideration to the Senate, S. 1396, 104th Cong. (1995), and House, H.R. 2539, 104th Cong. (1995), respectively. The appropriations legislation for the agency sunset was enacted on November 15. Department of Transportation and Related Agencies Appropriations Act, Pub.L. No. 104–50, 109 Stat. 436 (1995).

As the substantive and appropriations bills moved through Congress, senior management at the ICC held discussions with Congress and the Department of Transportation regarding the transferring of some ICC functions to the STB and the FHA. The functions to be transferred were based on a report created by the ICC one year earlier at the direction of Congress. That report was the result of an internal study of the ICC's regulatory functions and recommended whether each identified function should be retained, modified, or eliminated. Although the funding levels were yet to be approved as of the summer of 1995, officials at the ICC and FHA tentatively agreed that approximately sixty positions would be transferred from the former agency to the latter. ICC officials then informed Congress that the FHA would require funding for the approximately sixty full-time positions that would be required to carry out the functions to be transferred to the FHA.

Before the board, senior management at the ICC testified that by late September

there was little doubt that the agency would be abolished and that a RIF at the end of 1995 was inevitable. On October 2, 1995, the agency notified all of its employees that their positions were to be abolished by a RIF on December 5, 1995. That date was extended to December 31 in light of the appropriations bill passed in November, which provided funding through that date. On December 31, the agency conducted a "transfer of function" pursuant to the regulations, *see* 5 C.F.R. §§ 351.301–303 (1997), transferring certain functions to the FHA and certain other functions to the STB. Employees identified as holding positions within the identified functions were transferred out of the ICC. Employees remaining at the ICC after the transfer were separated by a RIF on that same day. Because the newly created STB was not funded sufficiently to absorb all of the employees transferred from the ICC, a number of the transferred employees were separated from the STB in a RIF conducted on January 6, 1996.

Petitioners were all employed at the ICC until its abolition. Ms. Phillips was separated from the ICC by a RIF on its final day in existence. The remaining petitioners were transferred to the STB and were then separated by a RIF from that agency on January 6, 1996. Each petitioner appealed his or her separation to the board, where the cases were consolidated for consideration.

Before the board, Petitioners argued that the RIFs at the ICC and its successor agency were conducted for an improper purpose and were not in accordance with the pertinent regulations. Petitioners also challenged the timing of the RIFs, arguing that the RIFs should have been conducted prior to the transfers of function to other agencies. They further argued that, had the RIFs and transfers of function been conducted properly, they each would have retained their positions either at the STB or at the FHA.

On May 31, 1996, an Administrative Judge (AJ) issued an initial decision sustaining the agency's actions with regard to the RIFs and the transfers of function. The AJ found that the RIFs had been conducted for a proper purpose and in accordance with the regulations. The AJ found that the agencies conducted the RIFs because of a shortage of funds. The AJ also found the notice of the RIFs to be legally sufficient and in accordance with the pertinent statutes and regulations. Additionally, after an extensive, thorough, and detailed analysis, the AJ found that the procedures followed for the transfers of function from the ICC were proper and in accordance with law. The initial decision became final when the full board denied Petitioners' petition for review. *See* 5 C.F.R. § 1201.113 (1997). Petitioners now seek review by this court. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(9) (1994).

## DISCUSSION

When reviewing a decision by the board, we may reverse only if the decision was arbitrary, capricious, an abuse of discretion, or unlawful; procedurally deficient; or unsupported by substantial evidence. 5 U.S.C. § 7703(c) (1994); *Cheeseman v. Office of Personnel Management,* 791 F.2d 138, 140 (Fed. Cir.1986).

Petitioners first argue that a RIF may not be initiated to conduct a de facto "sunset" of an agency without Congressional authorization. Because the legislation abolishing the ICC had not been enacted at the time the RIFs were initiated, Petitioners argue, the RIFs could not have been conducted for a proper purpose. Likewise, Petitioners argue that there could not have been a lack of funding at the agency until the appropriations bill had passed.

The agency responds that a RIF is conducted for a proper purpose so long as the agency officials genuinely believe that at least one of the permissible reasons for conducting the RIF is imminent. *See* 5 C.F.R. § 351.201(a)(2) (1997) (stating that a shortage of funds and a lack of work are two permissible reasons for conducting a RIF). The agency argues that the decision regarding whether to conduct a RIF based upon such a belief is left to agency discretion.

We agree with the agency that its decision to conduct an agency-wide RIF was not improper. Generally, determining when a RIF is appropriate is a matter of an agency's independent managerial discretion. *See Grier v. Department of Health and Human Servs.*, 750 F.2d 944, 945–46 (Fed.Cir.1984) (noting that a RIF is not aimed at removing particular individuals, but is directed solely at positions). By statute, the OPM is obligated to prescribe regulations for the release of competing employees in a RIF that "give due effect to—(1) tenure of employment; (2) military preference . . .; (3) length of service; and (4) efficiency or performance ratings." 5 U.S.C. § 3502 (1994). However, Congress has not specified the circumstances under which RIFs may be appropriate, but has given the OPM wide latitude in prescribing regulations for agencies to manage their work forces. *See* 5 U.S.C. § 1302 (1994). The implementing regulations regarding RIFs are found in 5 C.F.R. Part 351. Section 351.201 of the regulations states:

> (a)(1) Each agency is responsible for determining the categories within which positions are required, where they are located, and when they are to be filled, abolished, or vacated. This includes determining when there is a surplus of employees at a particular location in a particular line of work.
>
> (2) Each agency shall follow this part when it releases a competing employee from his or her competitive level . . . when the release is required because of lack of work; shortage of funds; insufficient personnel ceiling; reorganization; the exercise of reemployment rights; or reclassification of an employee's position [due] to erosion of duties. . . .

5 C.F.R. § 351.201(a) (1997).

As long as a RIF is legitimately conducted for one of the reasons identified in the regulation, it will not be disturbed "absent a clear abuse of discretion or a substantial departure from applicable procedures." *Gandola v. Federal Trade Comm'n*, 773 F.2d 308, 313 (Fed.Cir.1985); *Cooper v. Tennessee Valley Auth.*, 723 F.2d 1560, 1562 (Fed.Cir. 1983). In this case, the board found that the agency officials reasonably anticipated a budget shortfall and a lack of work due to the imminent demise of the agency. Where agency officials reasonably and genuinely believe that the agency's abolition is inevitable and its funding is to be terminated, initiation of a RIF is proper. It is in fact necessary because of the statutory notice provision that normally requires employees to be notified sixty days before their separation date.

Conducting a RIF because of an anticipated shortage of funds does not require that the shortage exist at the time of the RIF. There is no reason for agency officials who are aware of imminent legislation progressing through Congress to wait until the legislation is enacted before taking appropriate action. Any significant delay by the ICC officials could have risked leaving insufficient time to accomplish an orderly sunset of the agency and an orderly transfer of those functions being preserved. Initiating an agency-wide RIF prior to the enactment of the actual legislation was prudent in this case given the short time frame within which the agency had to deal with the problem; the ICC Termination Act, Pub.L. No. 104–88, was enacted only three days before the agency was to be abolished. Had agency officials waited until the agency's abolition was a legislative fact, employees would have been separated without adequate notice or the agency might have maintained the employees in their jobs without adequate funding, possibly in violation of the Anti–Deficiency Act. *See* 31 U.S.C. § 1341 (1994).

Whether the agency officials honestly and reasonably anticipated a budgetary shortfall is a question of fact. One of the agency officials testified that "the legislative mood was clear by September that the ICC would be abolished by December 31." The AJ found this assessment to be realistic, reasonable, and temperate and found the official to be credible, reliable, and knowledgeable. Petitioners have not drawn this court's attention to any information or evidence that

would call into question the credibility of that official's testimony. Moreover, the AJ's finding that the RIFs were conducted for a proper purpose was based on the undisputed facts regarding the status of the legislation and on the AJ's conclusion that the agency officials' testimony concerning their reason for implementing the RIFs was credible. Because the AJ's findings of fact were based on credibility determinations regarding the testifying witnesses, these findings are "virtually unreviewable." *Hambsch v. Department of Treasury,* 796 F.2d 430, 436 (Fed. Cir.1986).

█ Petitioners further argue that the notice they received from the ICC was not effective for the RIF conducted at the STB. This argument is without merit. The STB was created simultaneously with the abolition of the ICC. At the time the agency was required to give the employees notice of the RIF, the STB employees were all working for the ICC. Thus, it was not improper for the ICC to give its employees notice of the RIF to be conducted at the STB. There was no procedural irregularity in the fact that notice was given while some of the employees were in one agency while their RIFs occurred while they were in another.

Petitioners next argue that the timing of the RIFs violated the governing statutes and regulations. According to Petitioners, when a RIF is conducted in conjunction with a transfer of function, the RIF should be conducted first, followed by the transfer. Otherwise, petitioners argue, civil service employees who would have superior retention rights during a RIF are given less favorable treatment than employees holding positions covered by the transferred functions, thus contravening the principles behind the merit system.

█ We disagree. Of course, once a RIF is initiated, it must be conducted pursuant to the procedures outlined in the statutes and regulations. Such procedures are intended to protect the civil service retention rights or preferences of competing employees. On the other hand, an employee occupying a position that is not being transferred to another agency does not have the right to "bump" an employee who is being transferred. Contrary to Petitioners' contentions, the regulations provide that when a RIF is conducted in conjunction with a transfer of function, the transfer of function should occur first, followed by the RIF. The pertinent regulation states:

> Before a reduction in force is made in connection with the transfer of any or all of the functions of a competitive area to another continuing competitive area, each competing employee in a position identified with the transferring function or functions shall be transferred to the continuing competitive area without any change in the tenure of his or her employment.

5 C.F.R. § 351.302(a) (1997). Therefore, once the agency determined that it would conduct a RIF at the time of the agency's demise, a determination that was within the agency's broad discretion, *see Gandola,* 773 F.2d at 313, it was compelled by the regulation to transfer those employees whose positions were being transferred before conducting the RIF.

█ Petitioners further argue that the RIFs and transfers of function were procedurally flawed. Specifically, Petitioners contend that the agency erroneously identified the functions to be transferred to the FHA, failed to properly transfer functions to the STB, and failed to recognize that each of Petitioners should have been identified with a transferred function. We do not agree. A decision made during a RIF "on the composition and structure of the work force reflects the kind of managerial judgment that is the essence of agency discretion, and is not [subject to] judicial evaluation." *Gandola,* 773 F.2d at 311. Moreover, these arguments essentially challenge the factual findings of the board. We review these factual findings for substantial evidence. We do not substitute our judgment for that of the board as to the weight of the evidence or the inferences to be drawn therefrom. *See Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) (stating that "the possibility of drawing two in-

consistent conclusions from the evidence does not prevent [the fact finder's] findings from being supported by substantial evidence"). The board found that the agency followed the proper procedures in identifying the functions for transfer, the positions that correspond to each function, and the employees meeting the criteria for the transferred positions. The board also found that none of the petitioners qualified for transfer to the FHA and all were properly separated by RIF from either the ICC or the STB. All of these findings are supported by substantial evidence. We have considered Petitioners' remaining arguments and find them to be without merit.

## CONCLUSION

The board did not err in determining that the ICC properly initiated a RIF due to an expected budgetary shortfall notwithstanding the fact that the legislation creating the shortfall and abolishing the agency had not yet been enacted. Furthermore, the board's factual findings that the RIFs and associated transfers of function were conducted properly are supported by substantial evidence. Accordingly, the decision of the Merit Systems Protection Board is

*AFFIRMED.*